[No. 767-3.    Division Three.    July 10, 1973.]

THE STATE OF WASHINGTON, *Respondent*, v. BENNIE SMITH, *Appellant.*

*Charles Thorfin Schillberg,* for appellant (appointed counsel for appeal).

*Paul Klasen, Prosecuting Attorney,* for respondent.

GREEN, C.J.—Defendant, Bennie Smith, and Gregory Paul Carter were jointly charged with one count of armed robbery and eight counts of assault in the second degree. They waived jury trial and were jointly tried and convicted by the court. Each defendant filed separate appeals. This appeal concerns Bennie Smith.

Defendant assigns error to the trial court's denial of his motions to (1) suppress evidence obtained when he was arrested; (2) suppress evidence of a photographic lineup; and (3) dismiss the assault counts.

On October 13, 1972, at approximately 2:30 p.m., the Credit Bureau of Central Washington in Moses Lake was robbed by two Negroes—one short and one tall—armed

with revolvers. Several rolls of coins, some loose change, a $50 bill and other bills were taken. Two possible suspects were observed earlier in the area, driving a blue or green older car. Officer Peterson of the Washington State Patrol received this information on his radio.

At 4:24 p.m., Peterson, on patrol near Dryden, observed a green 1966 Buick with Minnesota plates, containing two Negroes. Peterson followed the vehicle on the Blewett Pass highway for 30 minutes. During that time he radioed for more information on the robbery, requested assistance and a roadblock. Officer Kidd of the State Patrol soon proceeded to follow Peterson's vehicle. The suspect vehicle turned into the Mineral Springs Lodge restaurant area. Peterson pulled along the passenger side and Kidd pulled along the driver's side of the vehicle. Both officers stepped out of their respective patrol cars with shotguns. Kidd ordered the pair to freeze. As Peterson walked forward to the suspect car, he saw two revolvers lying on the floor near the front seat on the passenger side of the car. The officers instructed the occupants to walk to the rear of their car where they were searched. A $50 bill and a roll of coins were found on defendant Smith. Shells for the pistols and four rolls of pennies marked "Utico of Moses Lake" were found on Carter. Testimony linked these items to the robbery.

First, defendant contends the court erred in denying his motion to suppress evidence obtained at the time of arrest because it was obtained in a search incident to an unlawful arrest. Defendant claims the officers did not have probable cause to arrest him. We disagree.

■ Police officers, in appropriate circumstances and in an appropriate manner, may detain persons for purposes of investigating possible criminal behavior, even though there is no probable cause to make an arrest. *Adams v. Williams*, 407 U.S. 143, 32 L. Ed. 2d 612, 92 S. Ct. 1921, 1923 (1972); *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968); *State v. Gluck*, 7 Wn. App. 811, 502 P.2d 1222 (1972).

Prior to approaching the defendants, the officers were informed of an armed robbery committed by two Negro men, one short and one tall, possibly driving a green or blue older model automobile. When Peterson commenced following the suspect vehicle about 4:24 p.m. on Blewett Pass, he knew it was reasonably within appropriate driving distance from Moses Lake, considering the time of the robbery. These facts were sufficient to cause Peterson to suspect that the two occupants of the automobile may have committed the Moses Lake robbery. The manner in which the officers approached the suspected individuals was reasonable because the robbers were reported to be armed. When Peterson approached the vehicle and saw two revolvers in plain view in the suspects' automobile, probable cause existed to believe they were the robbers and arrest them. The items obtained in the ensuing search were properly admitted into evidence.

█ Second, defendant contends the court erred in denying his motion to suppress evidence of a photographic identification of him upon the ground the procedure was impermissibly suggestive, giving rise to a very substantial likelihood of irreparable misidentification. He asserts the photographs used to identify him were distinguishable from the other photographs shown to the witnesses, thereby tainting his identification. We disagree.

On Monday following the Friday robbery, seven of eight eyewitnesses participated in a photographic lineup. Although the defendants were in custody, a photographic lineup was used due to the lack of Negro males in the Grant and Adams county jails, rendering a corporal lineup impractical. See State v. Nettles, 81 Wn.2d 205, 210, 500 P.2d 752 (1972); State v. Cantrell, 81 Wn.2d 213, 500 P.2d 777 (1972). Each witness, while out of the presence of the other witnesses, viewed 11 photographs of Negro males. Eight of the photographs were 2½ by 3½ inches in size, and three were 3 by 5 inches. Only two of the 3- by 5-inch photos were of defendant Smith. The 11 photos were shuffled before each witness viewed the pictures. Only the

officer conducting the lineup knew the identity of the person in the photo. Although the use of two 3- by 5-inch photos of the defendant in the photographic lineup was not an ideal procedure, we do not believe the size of the photographs used resulted in impermissible suggestiveness giving rise to a very substantial likelihood of irreparable misidentification. This is evidenced by the fact that only three of seven witnesses identified defendant Smith's photograph.

While we find no error in the admission of the photographic identification evidence, it is noted that defendant's conviction does not rest solely upon the photo identification. One witness, who did not participate in the photographic identification, identified defendant Smith at the trial as a participant in the robbery. Further, the items found in the possession of defendant on his arrest were identical to items taken in the robbery.

■ Finally, error is assigned to the court's refusal to dismiss the second-degree assault charges against defendant upon the ground that assault in the second degree[1] is in-

---

[1]Assault in the second degree is defined in RCW 9.11.020:

"Every person who, under circumstances not amounting to assault in the first degree—

"(1) With intent to injure, shall unlawfully administer to or cause to be taken by another, poison or any other destructive or noxious thing, or any drug or medicine the use of which is dangerous to life or health; or

"(2) With intent thereby to enable or assist himself or any other person to commit any crime, shall administer to, or cause to be taken by, another, chloroform, ether, laudanum or any other intoxicating narcotic or anaesthetic; or

"(3) Shall wilfully inflict grievous bodily harm upon another with or without a weapon; or

"(4) Shall wilfully assault another with a weapon or other instrument or thing likely to produce bodily harm; or

"(5) Being armed with a deadly weapon shall wilfully assault another with a whip; or

"(6) Shall assault another with intent to commit a felony, or to prevent or resist the execution of any lawful process or mandate of any court officer, or the lawful apprehension or detention of himself or another person; or

"(7) While hunting any game or other animals or birds, shall shoot another;

"Shall be guilty of assault in the second degree and be punished by

cluded in the offense of robbery.[2] The state contends that because the assault occurred after completion of the robbery when defendant and his partner, Carter, herded eight of the employees of the credit union into a back room prior to departure, a separate crime was committed. On the other hand, defendant contends the act of herding the employees into the back room occurred during the course of the robbery, was a part of and included in it and, therefore, the assault charges should have been dismissed. We disagree.

The acts of force necessary to commit the robbery were different from the acts of force exerted against the employees who were herded into the back room. The latter act of force was exerted to ensure defendant's escape—not to obtain credit union property. If the police had arrived before all of the employees were removed to the back room but after the property had been obtained, it is evident that a conviction of defendants for robbery would still stand. Consequently, the assault that occurred in herding the employees into the back room to ensure escape is separate and distinct from the force required for the robbery. This distinction is recognized under the robbery statute, RCW 9.75.010 which provides that force "if used merely as a means of escape, . . . does not constitute robbery."

---

imprisonment in the state penitentiary for not more than ten years or by a fine of not more than one thousand dollars, or by both."

[2]"Robbery" is defined in RCW 9.75.010:

"Robbery is the unlawful taking of personal property from the person of another, or in his presence, against his will, by means of force or violence or fear of injury, immediate or future, to his person or property, or the person or property of a member of his family, or of anyone in his company at the time of the robbery. Such force or fear must be used to obtain or retain possession of the property, or to prevent or overcome resistance to the taking; in either of which cases the degree of force is immaterial. If used merely as a means of escape, it does not constitute robbery. Such taking constitutes robbery whenever it appears that, although the taking was fully completed without the knowledge of the person from whom taken, such knowledge was prevented by the use of force or fear. Every person who shall commit robbery shall be punished by imprisonment in the state penitentiary for not less than five years."

Therefore, defendant's motion to dismiss the assault counts was properly denied.[3] We note that the sentence for assault was to run concurrently with the sentence for robbery. *See State v. Lopeman,* 143 Wash. 99, 101, 254 P. 454 (1927).

Judgment affirmed.

MUNSON and McINTURFF, JJ., concur.

Petition for rehearing denied August 16, 1973.

Review denied by Supreme Court October 9, 1973.

---

[3]California, while interpreting a statute prohibiting more than one punishment for a single act, reached a similar conclusion. *Ex parte Chapman,* 43 Cal. 2d 385, 273 P.2d 817 (1954); *Neal v. State,* 55 Cal. 2d 11, 357 P.2d 839, 9 Cal. Rptr. 607 (1961). Under our view of the facts, *State v. Wilder,* 4 Wn. App. 850, 486 P.2d 319 (1971), and *Zovick v. Eaton,* 259 App. Div. 585, 20 N.Y.S.2d 447 (1940), relied upon by defendant are distinguishable.